**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JAMES C MOONEY,<br>Plaintiff,<br><br>v.<br><br>AINSWORTH, INC. *et al.*,<br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>: | Civil No.: 5:25-cv-03598-JMG |

**MEMORANDUM OPINION**

**GALLAGHER, J.** **October 8, 2026**

## I. OVERVIEW

This case originally arose from Defendants Ainsworth, Inc.'s ("Ainsworth") and GDI Integrated Facility Services, Inc.'s ("GDI") (collectively, "Defendants") alleged failure to pay Plaintiff James C. Mooney, in his Capacity as the Representative of the Former Members of Enginuity LLC ("Sellers"), pursuant to the terms of a Membership Interest Purchase Agreement ("MIPA"). On March 4, 2026, Defendants sought leave to file an Amended Answer and Counterclaim to Plaintiff's Complaint in which they sought indemnification pursuant to the MIPA for alleged misrepresentations by Plaintiff. The Court granted in part Defendants' Motion allowing the counterclaim for indemnification to proceed. Plaintiff moved for summary judgment seeking to dismiss Defendants' counterclaim. For the following reasons, Plaintiff's motion is **DENIED.**

## II. BACKGROUND

### A. The Membership Interest Purchase Agreement ("MIPA")

On September 1, 2021, the Sellers[1] of Enginuity, LLC ("Enginuity") entered into the MIPA with Defendant Ainsworth[2] in which Ainsworth purchased all the Company Units of Enginuity as of the Closing Date. *See* Statement of Undisputed Material Facts in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s SMF"), ¶¶ 1, 3 (ECF No. 78); Resp. to Pl.'s Statement of Undisputed Material Facts and Additional Facts in Opp. of Pl.'s Mot. for Summ. J. ("Resp. to Pl.'s SMF"), ¶¶ 1, 3 (ECF No. 94). The MIPA provides that the "Closing Date" is the date of execution of the MIPA which is September 1, 2021. *See* Pl.'s SMF ¶ 2; Resp. to Pl.'s SMF ¶ 2.

Article IV of the MIPA is titled "Representations and Warranties of the Sellers and the Companies" and states in introduction that "[a]s a material inducement to the Buyer to enter into this Agreement, except as set forth in the disclosure schedules delivered by the Company and the Sellers to Buyer concurrently with the execution of this Agreement (the "Disclosure Schedules"), each of the A Members and the Company hereby jointly and severally represent and warrant to Buyer as follows as of the date hereof[.]" Appendix, at Appx. 17. Section 4.16 of Article IV – titled "Tax Matters" – includes a representation and warranty that "The Company has not deferred any Taxes pursuant to the CARES Act or IRS Notice 2020-65 (or any corresponding or similar provision of any state, local or foreign Law enacted in connection with COVID-19) and has not affirmatively applied for, filed for or otherwise claimed any Tax credits pursuant to the CARES

[1] James C. Mooney is acting as representative of the "Sellers" which consists of all members of Enginuity who held Class A Common Units ("A Members") and all members of the Company who were not A Members but who held Class B Common Units. Appendix to Plaintiff's Motion for Summary Judgment (ECF No. 83) ("Appendix"), at Appx. 10.

[2] According to the MIPA, Defendant Ainsworth is an indirect wholly owned subsidiary of Defendant GDI and GDI agreed to act a payment gaurentor for Ainsworth under the agreement. Appendix, at Appx. 10, 58.

Act (or any corresponding or similar provision or any state, local or foreign Law enacted in connection with COVID-19).” Appendix, at Appx. 35.[3]

Section 7.2 of the MIPA is titled “Indemnification” and provides:

> (a) Indemnification by the Sellers. Subject to Section 7.2(b), the A Members shall jointly and severally indemnify Buyer, the Company, and their respective officers, managers, directors, officers, partners, agents, employees, representatives, Affiliates, subsidiaries, parents, assigns, successors and predecessors (other than Sellers) (collectively the “Buyer Parties” and hold each of them harmless from and against and pay on behalf of or reimburse such Buyer Parties in respect of any Loss which any such Buyer Party may suffer, sustain, or become subject to, through and after the date of the claim for indemnification as a result of, arising out of, in the nature of, caused by, or relating to:
>
> (i) the breach of any representation or warranty made by any of the Sellers, Representative, or the Company contained in this Agreement or the Transaction Documents; . . .

**B. The Employee Retention Credit (“ERC”)**

Disputes arise regarding Sellers’ pursuit of an Employee Retention Credit (“ERC”) –a tax credit offered in connection with the CARES Act.

On July 19, 2021, Daniel Maurer, Enginuity’s head of finance, emailed David Hinchey, GDI’s Executive Vice President of Corporate Development, informing Mr. Hinchely that Mr. Maurer was checking to see if Enginuity was eligible for the ERC and stating that he “[j]ust wanted to make sure it was okay for Enginuity to pursue.” Appendix, at Appx. 217. Mr. Hinchey responded, “To be honest I’ve got no clue on the employee retention credit, but anything you can claim prior to the closing date is yours.” *Id.* The parties disagree about the significance of this exchange. Plaintiff states that Sellers asked for permission to apply for the ERC and that permission was granted. *See* Pl.’s SMF ¶¶ 34-35. Defendants dispute that characterization and direct the Court to testimony in which Mr. Hinchey stated “I remember having an email from their

[3] The “CARES Act” is the Coronavirus Aid, Relief and Economic Security Act of 2020. Appendix, at Appx. 59.

VP of finance preclosing asking if they could file, and I said, as long as you file preclosing and you get the funds preclosing, then, yes, you can. But after that I heard nothing from them whether they did or not." *See* Resp. to Pl.'s SMF ¶¶ 34-35; Supplemental Appendix to Defendants Response in Opposition to Plaintiff's Motion for Summary Judgment ("Supp. Appendix"), at Supp. Appx. 26-27. He further testified that he "assumed that they had not filed for it because of the statements that they made in the schedules of the first agreement, you know, where they essentially stated they had not filed for it." Supp. Appendix, at Supp. Appx. 27.

Nevertheless, the Parties agree that on August 20, 2021, Alliant Group, a third-party consulting firm hired by Enginuity, calculated a potential ERC of $648,116 for Q4 of 2020 based on qualifying wage expenses. *See* Pl.'s SMF ¶ 6; Resp. to Pl.'s SMF ¶ 6; Appendix, at Appx. 76.

The parties further agree that on December 21, 2021 – after the Closing Date – Plaintiff filed an ERC application (Form 941-X) in which it claimed a tax-refund of $648,116.44 for pre-closing tax payments made by Enginuity. *See* Pl.'s SMF ¶ 36; Resp. to Pl.'s SMF ¶ 8-9; Appendix, at Appx. 220-225.

The Parties disagree however whether this application was the first time that Enginuity had applied for – or otherwise claimed – the ERC. For example, Defendants direct the Court to testimony from Mr. Maurer in which – when asked about whether Enginuity had, as of September 2021, "applied for tax credits in connection with any COVID-19-related act or legislation or regulation" – he responded "Yes. . . . We had the Alliance Group [sic] help us with some tax credits. We also did the PPP. So there was two different ones there, yeah. But we didn't do the second PPP." Resp. to Pl's SMF ¶ 36; Supp. Appendix, at Supp. App'x 78.

Regardless of when application for the ERC began or was submitted, the Parties agree that Enginuity sought to include the calculated ERC amount as revenue in the Closing Working Capital Statement. *See* Pl.'s SMF ¶¶ 8-9; Resp. to Pl.'s SMF ¶¶ 8-9.

**C. The Working Capital Adjustment**

Pursuant to the MIPA, the purchase price was $17,650,000.00 but this price was subject to applicable adjustments after the Closing Date. *See* Pl.'s SMF ¶ 4; Resp. to Pl.'s SMF ¶ 4. One such adjustment was referred to as the "Working Capital Adjustment." *See* Pl.'s SMF ¶ 5; Resp. to Pl.'s SMF ¶ 5. The Working Capital Adjustment adjusted the purchase price based on Enginuity's Closing Working Capital, as determined by the Closing Working Capital Statement. Appendix, at Appx. 14. The purchase price would be adjusted by an amount equal to $4,000,000 minus the Closing Working Capital. *Id.* If this difference were negative (meaning the Closing Working Capital was less than $4,000,000), then the purchase price would be increased – dollar for dollar – by the absolute value of the difference. *Id.* If this difference were positive (meaning the Closing Working Capital was greater than $4,000,000), then the purchase price would be decreased – dollar for dollar – by the difference. *Id.* In other words, the greater the Closing Working Capital, the more Defendants would be required to pay under the MIPA.

The Parties describe a back-and-forth negotiation over the Closing Working Capital Statement in which the ERC was eventually included as revenue – raising the overall Closing Working Capital. On November 16, 2021, Daniel Maurer, Enginuity's Chief Financial Officer sent Jonathan Giaramita, Ainsworth's Vice President of Finance, a spreadsheet described as a "Trail Balance" as of August 31, 2021 (the day before the Closing Date). Pl.'s SMF ¶ 12; Resp. to Pl.'s SMF ¶ 12; Appendix, at Appx. 108-109. After receiving the spreadsheet, Mr. Giaramita emailed Charles-Etienne Girouard, GDI's Director of Financial Information, stating "please see the

attached trial balance from 08.31.2021, which includes the balance sheet accounts. In speaking with Daniel, since disclosing the closing balance sheet at the conclusion of the deal, he's create [sic] an account for Employee Retention Credit as an asset (approximately $650k) and as added revenue pre-deal." *Id.* On December 20, 2021, a senior account manager at Ainsworth shared an Excel spreadsheet with a tab titled "Work Cap." Pl.'s SMF ¶ 14; Resp. to Pl.'s SMF ¶ 14; Appendix, at Appx. 128-135. The "Work Cap" tab included a row for "Miscellaneous receivable" and a note stating "Jonathan to review the employee retention credit specifically." Pl.'s SMF ¶ 16; Resp. to Pl.'s SMF ¶ 16.

Upon seeing the inclusion of the ERC as a receivable, Defendants state that they sought supporting information from Sellers. Resp. to Pl.'s SMF ¶ 14. Regarding the additional information about the ERC received from Sellers, Paul Mota, Ainsworth's Head of Finance, testified:

> So they -- they contracted Alliant to do the initial study, and the Alliant submitted an application on their behalf, again, with an estimate amount that they were going to get 650,000 ish. So we were told this has -- this has been submitted. This is coming to us. It should be paid to us, you know, any day. So, yeah, based on that information, and we -- we had copies of the invoice from Alliant with their estimate of their fee and everything else, so we agreed to that as part of the working capital with the expectation we would get paid, so we paid the sellers at that point.

Appendix, at Appx. 121.

On April 1, 2022, Mr. Giaramita sent an updated spreadsheet to Mr. Hinchey and Mr. Mota which he described as "the final Working Capital worksheet." Appendix, at Appx. 142. The spreadsheet again included a tab titled "Work Cap" which included a row for "Miscellaneous receivable". Pl.'s SMF ¶ 17; Resp. to Pl.'s SMF ¶ 17; Appendix, at Appx. 148. The row included a comment stating "Jonathan reviewed the employee retention credit – it is ok. Amount may need to be adjusted – Jonathan & Anastasia to discuss." Pl.'s SMF ¶ 18; Resp. to Pl.'s SMF ¶ 18; Appendix, at Appx. 148.

The parties dispute what, if any, validation was performed on the ERC by Ainsworth. Plaintiff states that the Excel document shared between Ainsworth and GDI employees was used to track its review and validation of any items, and that Ainsworth "vetted" all items Enginuity included in its working capital submission. Pl.'s SMF ¶¶ 15, 44. Defendants dispute this and state that any review of the ERC was limited to its value and that they did not review any documentation as to its validity or how it was computated. Resp. to Pl.'s SMF ¶ 15. Defendants further state that Mr. Mooney represented that Alliant Group had already submitted an application for the ERC on Enginuity's behalf and that the full amount of the ERC was almost guaranteed. Resp. to Pl.'s SMF ¶ 44.

Regardless, the Parties agree that the ERC was included in Enginuity's final Working Capital Statement in the amount of $648,116.44 and the associated fee to Alliant Group was included as a liability in the amount of $147,446.39. Pl.'s SMF ¶ 21; Resp. to Pl.'s SMF ¶ 21. The Parties further agree that on July 18, 2022, Mr. Giaramita sent an email to Mr. Hinchey indicating that the final agreed Closing Working Capital was in the amount of $4,000,000, resulting in no adjustment to the purchase price under the MIPA. Pl.'s SMF ¶ 56; Resp. to Pl.'s SMF ¶ 56; Appendix, at Appx. 260.

**D. Resolution of the ERC and Defendants' Indemnification Claim**

On September 8, 2023, the IRS sent a notice indicating that the Enginuity's ERC was disallowed. Pl.'s SMF ¶ 22; Resp. to Pl.'s SMF ¶ 22. Ainsworth appealed this decision. *Id.* On January 20, 2026, Ainsworth entered into a settlement agreement with the IRS resolving the ERC appeal in which the IRS disallowed only a portion of the total $648,116 ERC claim. Pl.'s SMF ¶ 23; Resp. to Pl.'s SMF ¶ 23; Appendix, at Appx. 204. The IRS issued a check to Enginuity – now owned by Defendants – dated April 7, 2026, and in the amount of $720,668.31. Pl.'s SMF ¶ 24;

Resp. to Pl.'s SMF ¶ 24. Defendants contend that only approximately $388,000 of this payment corresponds to the negotiated ERC amount and the remainder of the payment is still being investigated. Resp. to Pl.'s SMF ¶ 24.

On September 19, 2025, Christian Marcoux, Chief Legal Officer and Secretary for GDI sent Mr. Mooney a "Formal Notice of Claim" pursuant to the MIPA in which he asserted that Defendants were entitled to indemnification under Sections 6.1 and 7.2 of the MIPA and sought reimbursement for the unrealized ERC value. Pl.'s SMF ¶¶ 57-58; Resp. to Pl.'s SMF ¶¶ 57-58; Appendix, at Appx. 338-339.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure Rule 56(c) provides that the district court must "grant summary judgment if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Essentially, the Court must analyze "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52. A genuine issue of fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). At this stage of litigation, all facts presented are viewed in the light most favorable to the nonmoving party. *Daniels v. City of Pittsburgh*, No. 22-1790, 2023 WL 2707178, at *2 (3d Cir. Mar. 30, 2023).

To survive a properly supported motion for summary judgment, the nonmoving party, Defendants in this case, must present affirmative evidence of specific facts to demonstrate a genuine issue of material fact. *Anderson*, 477 U.S at 256-57; *Berckeley Inv. Grp., Ltd. v. Colkitt*,

455 F.3d 195, 201 (3d Cir. 2006) (citing *Pa. Prot. & Advoc., Inc. v. Pa. Dep't of Pub. Welfare,* 402 F.3d 374, 379 (3d Cir.2005)) ("Although the non-moving party receives the benefit of all factual inferences in the court's consideration of a motion for summary judgment, the nonmoving party must point to some evidence in the record that creates a genuine issue of material fact."). "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Colkitt*, 455 F.3d at 201; FED. R. CIV. P. 56(c)(1)(A) (requiring any party asserting a fact to "cit[e] to particular parts of materials in the record"). Statements of Disputed Facts are not evidence, so a "district court may not rely solely on" them to justify a finding that a dispute of material fact exists. *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 n.8 (3d Cir. 2006), *as amended* (May 5, 2006) (internal citation omitted).

In applying this standard, "the court must construe the evidence in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences." *Barton & Pittinos, Inc. v. Smithkline Beecham Corp.*, 118 F.3d 178, 181 n.3 (3d Cir. 1997) (citing *Meinhardt v. Unisys Corp. (In re Unisys Sav. Plan Litig.)*, 74 F.3d 420, 433 n.10 (3d Cir. 1996)). At the summary judgment stage, the Court's role is not to weigh the evidence and determine the ultimate truth of the allegations. *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019); *see also InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 160 (3d Cir. 2003) ("When analyzing the evidence under this summary judgment standard, a court is not to weigh the evidence or make credibility determinations; these are tasks left for the fact-finder." (internal quotation marks omitted)). Instead, the Court's task is to identify and explain the law governing the matter, and then, in light of that law, determine whether there remains a genuine issue of fact for trial. *Id.*

## IV. ANALYSIS

Plaintiff makes four arguments as to why summary judgment is appropriate. First, that Defendants cannot establish that Enginuity breached the MIPA and Enginuity did not suffer an indemnity loss. Second, that Defendants' claim is time barred under the relevant statute of limitations. Third, that Defendants' claim is barred because it was paid to Sellers as part of a settlement. And finally, that Defendants' claim is barred by the voluntary payment doctrine.

### A. Defendants' Indemnification Counterclaim is Not Time-Barred

The Court first addresses Plaintiff's argument that Defendant's counterclaim is time-barred. Plaintiff argues that Defendants' "indemnity" claim is, in fact, a breach of contract claim masquerading as an indemnity claim. Therefore, the time to file suit began to run as soon as the date of the alleged breach which, in this case, would be the Closing Date of the MIPA. Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment (ECF No. 77) ("Pl.'s Br."), at 11-12. Defendants rely primarily on this Court's earlier April 7, 2026 Memorandum Opinion in which the Court allowed Defendant's counterclaim for indemnification to continue.[4] Defendants' Response in Opposition to Plaintiff's Motion for Summary Judgment

[4] Defendants are cautioned that the decision to allow the counterclaim for indemnification to continue was made under a substantially differently procedural posture than the instant Motion. The Court's opinion was therefore not as definitive as Defendants suggest. For example, in considering Plaintiff's arguments that i) the indemnification claim was time barred and ii) there was no indemnifiable loss, the Court sided with Defendants but made clear that this was at the motion to amend stage – where a Court applies the same relatively permissive standard of legal sufficiency as it would under Rule 12(b)(6). *See* ECF No. 44, at 11 ("It is unclear when the statute of limitations would have begun to run, so the Court declines to find it is time barred ***at this juncture***."); *see id.* ("***At this stage***, the Court declines to find that Defendants' indemnification claim is futile on these grounds."); *see also Montanez v. Price*, 154 F.4th 127, 152 (3d Cir.) ("Leave to amend is futile if the complaint, as amended, would fail to state a claim upon which relief could be granted.").

(ECF No. 95-1) ("Defs. Resp. Br."), at 14-15.[5] Plaintiff – in its primary argument – does not appear to dispute that if the Court were to consider the counterclaim as one which seeks indemnification then it would be timely under the Pennsylvania statute of limitations governing indemnification claims.[6] Similarly, Defendant does not appear to dispute that if this Court were to find its

[5] Defendants originally filed a response to Plaintiff's Motion on August 24, 2026 (ECF No. 93), which was the due date for any such response under this Court's Fifth Amended Scheduling Order. *See* ECF No. 62, at 2. One day later, Defendants filed a "Praecipe to Substitute" its previously filed response with a corrected version. Based on Defendants' representations in that Praecipe as well as the Court's review of both responses, the corrected response filled in a large number of citations which were missing in the original brief. Defendants' "corrected" response is untimely and Defendants did not seek leave to amend their original response. The Court would be within its rights to refuse to consider this untimely submission. Nonetheless, because the two responses are not substantively different, and in the interest of a more complete record, the Court will consider it. Any citations made in this Memorandum to Defendants' Response in Opposition to Plaintiff's Motion are made to the corrected version filed on August 25, 2026 as ECF No. 95-1 unless otherwise noted.

[6] Plaintiff does make two alternative arguments as to timeliness. Neither are persuasive.

The first is that the language of the MIPA does not extend the applicable statute of limitations or the time by which Defendants must file a "Notice of Claim." Pl. Br., at 13-14. These are two distinct issues that become muddled in Plaintiff's brief. Beginning with the statute of limitations, Plaintiff argues that the section of the MIPA which extends survival indefinitely, and thus beyond any statute of limitations, covers "covenants and agreements" and not the "representation and warranties" here. *Id.*, at 14. This is a strawman argument. The Court agrees – and Defendant does not appear to dispute – that the MIPA does not extend the applicable statute of limitations. The dispute arises over which statute of limitations applies – the one governing indemnification claims or breach of contract claims. Plaintiff separately argue however that an indemnification claim would also be barred because Defendant failed to timely serve a "Notice of Claim." Plaintiff argues that the MIPA only allows for recovery of a "Loss" if a "Notice of Claim" is served by an "Applicable Limitation Date." Plaintiff quotes the MIPA in defining an Applicable Limitation Date as "the date occurring twenty-four (24) months after the Closing Date. . . ." Plaintiffs omit the rest of the definition which immediately follows this quote, stating "provided that the Fundamental Representations shall survive until the expiration of the statute of limitations applicable to the subject matter of such representation and warranty." To the extent that Plaintiff is arguing that the Notice of Claim was served more than two years after the Closing Date of the agreement and is thus untimely, such an argument is belied by the clear text of the MIPA.

The second argument is that Defendants' claims are untimely since the applicable statute of limitations for the representations and warranties at issue are governed by 26 U.S.C. §§ 6511(a) and 6532(a)(1). These sections govern, respectively, i) when a claim for a credit or refund of an overpayment of federal tax must be filed and ii) that statute of limitations on disputing the

counterclaim were in fact just seeking damages for a breach of contract, then it would be time-barred.[7] Thus, the dispute turns on whether the counterclaim should be treated as a claim for indemnification – as it is pled on its face – or breach of contract.

Plaintiff's primary argument is that the counterclaim cannot be an indemnification claim because it does not involve a "shared liability or reimbursement of payment to a third party." Pl. Br., at 12. In other words, because the claim does not involve any actual outstanding tax liability to the IRS – and instead only a smaller than expected refund – there is no "loss" for Plaintiff to indemnify. *Id.* Plaintiffs argue that labeling the claim as "indemnification" does not change the fact that "it arises from and seeks damages based on whether a representation and warranty in the Agreement was true at the time of the Agreement." Plaintiffs further argue that there is no liability to a *third party* in this case. *Id.*

In support of its position, Plaintiff cites to caselaw and treatises which describe generally when indemnity may apply. *See* Pl. Br., at 11-12. However, as Defendants correctly highlight, it is the language of the indemnity contract which governs. *See Jacobs Constructors, Inc. v. NPS Energy Servs., Inc.*, 264 F.3d 365, 371 (3d Cir. 2001) ("If the indemnity clause is clear and unambiguous, then the intentions of the parties should be ascertained primarily by looking to the language used in the agreement."); *Devs. Sur. & Indem. Co. v. Chrisellie Corp.*, 497 F. Supp. 3d 9, 18 (W.D. Pa. 2020), *dismissed sub nom. Devs. Sur. & Indemnit v. Chrisellie Corp.*, No. 20-

---

disallowance of a tax claim. *See* 26 U.S.C. §§ 6511(a) and 6532(a)(1). As Defendants correctly argue, the dispute here is between Plaintiff and Defendants over indemnification, not between Defendants and the IRS. Therefore, the statute of limitations governing when a party must bring a tax claim are inapplicable to the instant dispute.

[7] Plaintiff is correct that the time to file a suit begins to run as soon as the right to institute and maintain a suit arises. *Ismail v. Kolman*, No. CV 24-5610, 2025 WL 3776041 (E.D. Pa. Dec. 29, 2025). For the breach of contract claim, this would be "on the date of the alleged breach" which the parties appear to agree would be on the Closing Date of the MIPA, September 1, 2021. *Id.*

3592, 2022 WL 18031493 (3d Cir. Oct. 3, 2022) ("[I]mplied indemnity principles are improper when an express indemnification contract exists.").

Plaintiff's characterization of what constitutes indemnifiable loss is overly narrow given the language of the MIPA. The MIPA provides that Sellers will indemnify against any "Loss" resulting from "the breach of any representation or warranty made by any of the Sellers, Representative, or the Company contained in this Agreement or the Transaction Documents." Appendix, at Appx. 49. The MIPA defines "Loss" to include "any damages, Liability, ***diminution in value***, demand, claim, action, cause of action, cost, damage, deficiency, Tax, penalty, fine or other loss or expense, whether or not arising out of a third party claim . . . ." Appendix, at Appx. 64.

As set forth in more detail in the sections below, Defendants have put forth factual support that Plaintiff breached a fundamental warranty by claiming that it had not "applied for, filed for or otherwise claimed" any tax credits pursuant to the CARES Act while they had in fact claimed such a tax credit. Defendants have previously argued that this breach and the subsequent denial of a portion of the ERC claimed by Plaintiff on the Working Capital Adjustment resulted in a tax position which "was materially worse than represented at the time of acquisition." ECF No. 39, at 8. In other words, and in the language of the agreement, Defendants argue that Plaintiff's breach resulted in a "diminution in value" of their tax obligation. Under the terms of the MIPA, this could constitute an indemnifiable loss and that loss was not realized until the Defendants had settled their claims with the IRS.

Courts have considered a similar question in the context of a property appraisal. In *Crester Mortg. v. Peoples Mortg.*, the court addressed a partial motion for summary judgment on an indemnification claim. 818 F. Supp. 816 (E.D. Pa. 1993). The case involved the sale of a mortgage

from the defendant to the plaintiff on a property appraised for $780,000. *Id.* at 818. The appraisal was overinflated, which was revealed after the property owner defaulted and an updated appraisal valued the property at $225,000. *Id.* The plaintiff – the purchaser of the mortgage – sought indemnification believing that the eventual sale of the property would not recoup its investment in the loan. *Id.* The Court did not dispute the right of the plaintiff to bring the claim but did rule that the claim would not be ripe until the property was actually sold, and therefore the amount the plaintiff could recoup would be more fully known. *See id.* at 820-821 ("Count I will be dismissed without prejudice to its reassertion, by amendment, if and when plaintiff's cause of action accrues (presumably upon the sale of the subject property)."). As in *Crester Mortg.*, the Defendants here are seeking indemnification for a loss which results, not from a payment *to* a third party, but from a diminution in value of an expected payment *from* a third party. And like the claim in *Crester Mortg.*, it was not ripe until the received value was fully known.

Nor is Plaintiff correct that the liability at issue is not owed to a third party. The primary cases cited by Plaintiff in support of its position are *Kessock v. Conestoga Title Ins. Co.* and *Xerox State & Local Solutions, Inc. v. Xchanging Solutions (USA), Inc.* Pl. Br., at 12. While these cases do suggest that indemnity typically requires a liability to a third party, they do not change the outcome here.[8]

[8] It is also worth noting that the court in *Xerox State & Local Solutions, Inc.*, was applying New York – as opposed to Pennsylvania – law. *See* 216 F. Supp. 3d 355, 360 (S.D.N.Y. 2016) ("Because this action was filed in a district court within the State of New York, we will apply New York's substantive law.") (quoting *Schiavone Constr. Co. v. City of New York*, 99 F.3d 546, 548 (2d Cir. 1996)).

Unlike the parties in *Kessock* and *Xerox State*, Defendants *are* alleging indemnity from liability to a third party.[9] Specifically, Defendants allege that they paid a higher price under the MIPA based on an expected value in a credit, the ERC, which was to be paid by a third party – the IRS. Defendants further allege that that value of that credit was diminished "as a result of, arising out of, in the nature or, caused by or relating to" a representation made by Plaintiff in the MIPA leaving Defendants in a worse financial position. *See* Appendix, at Appx. 49. Plaintiff may dispute the extent to which the diminished ERC received from the IRS arose from the representations made in the MIPA. But that is a factual dispute not appropriate for summary judgment. At issue here is whether Defendants have created a genuine issue of material fact regarding an indemnifiable loss under the MIPA. This Court finds they have.

**B. Defendants Have Submitted Evidence of an Indemnifiable Loss**

Notwithstanding the timeliness issue, Plaintiff argues that summary judgment is appropriate because i) Defendant cannot prove that Plaintiff breached the MIPA and ii) Defendant has not suffered an indemnifiable loss. The Court addresses each of these arguments in turn.

First, Plaintiff argues that the only warranty they are accused of breaching states that "[t]he Company has not deferred any Taxes pursuant to the CARES Act . . . and has not affirmatively applied for, filed or otherwise claimed any Tax credits pursuant to the CARES Act . . . ." and that this representation – which is written in the past tense – is made "as of the date hereof" Pl. Br., at 8-9. In other words, the representation is made as of the Closing Date of the MIPA – September 1, 2021. Plaintiff argues that the Sellers did not apply for the ERC until December 22, 2021 and therefore the representation was not false at the date of closing. Defendants does not appear to

[9] Because it is not necessary to the resolution of this Motion, the Court does not take a position on whether a third party liability must always be present under Pennsylvania law for an indemnity claim to exist.

dispute that the representation made in the MIPA was made as of the Closing Date. However, it argues that the Sellers represented not only that they had not "filed" for the ERC but that it had not "applied for, filed, ***or otherwise claimed***" the credit. Defendant argues that before the date of closing, the Sellers had claimed the ERC as a receivable and income on its books which renders the representation false. Defs. Resp. Br., at 12.

The Court agrees with Defendants. Defendants have presented facts that Enginuity had in fact at least claimed the ERC in its accounting before September 1, 2021. Defendants direct this Court to deposition testimony in which both Enginuity's head of finance at the time, Mr. Marurer, and Plaintiff's expert witness considered the ERC as at least recorded for accounting purposes before the closing date of the MIPA. When asked with Enginuity had applied for any tax credits in connection with any COVID-19-related act or legislation, Mr. Maruer testified that "[w]e had the Alliance Group [sic] help us with some tax credits. We also did the PPP. So there was two different ones there, year." Supplemental Appx., at Supp. Appx. 78. Plaintiff's Expert, John Stoner testified that the $648,116 expected credit was "recorded" by August of 2021 before the MIPA was executed. *Id.* at Supp. Appx. 119-121

Moreover, the parties agree that ERC was included in Enginuity's trial balance as of August 31, 2021 – and eventually including in the Closing Working Capital for the working capital adjustment – and recorded as an asset. *See* Pl.'s SMF ¶¶ 12-14; Resp. to Pl.'s SMF ¶¶ 12-14. Therefore, Defendants have presented sufficient evidence of a breach to defeat summary judgment.

Plaintiff separately argues that because the disputed funds were a reimbursement from the IRS as opposed to a liability owed, there is no "loss" which would be subject to indemnity. Defendants argue that Plaintiff misunderstands Defendants' theory of recovery. Defendants argue that they are not claiming that they expected $648,116 from the IRS but received less so they are

entitled to the difference. Defs. Resp. Br., at 18. Their argument is that Enginuity received purchase-price value on a $646,116 ERC asset and that asset ultimately proved materially smaller. *Id.* They argue this shortfall generated a loss through both the working capital adjustment process as well as the first of multiple post closing payments required under the contract. *Id.*

As discussed above, the MIPA defines "Loss" broadly for purposes of indemnification and its definition includes "diminution in value." Defendants' argument that it suffered a loss based on Plaintiff's false representation creates a potentially indemnifiable claim.[10]

### C. Defendants' Settlement of the Working Capital Adjustment Does Not Bar Defendants' Counterclaim

Plaintiff next argues that Defendants knowingly settled the Working Capital Adjustment by voluntary agreement and the counterclaim is an attempt to relitigate what was already settled. Pl. Br., at 16. In other words, Plaintiff argues that Defendants knew that the ERC was included in the Closing Working Capital Statement, vetted it and still agreed to it as a component of the eventual Closing Working Capital. Pl. Br., at 20. Because Defendants did not address the issue at the time – using the procedures defined in the MIPA – Plaintiff argues they have waived the right to challenge it after the fact. In essence, Platiniff's arguments – and the caselaw it cites – rely on the fact that a party cannot not challenge a settlement because the consequences were different than previously accepted.

[10] The amount Ainsworth received from the IRS totaled $720,688.13. Pl.'s SMF ¶ 24; Resp. to Pl.'s SMF ¶ 24. However, Defendant contends that only $388,000 of this amount corresponded to the negotiated ERC settlement. Resp. to Pl.'s SMF ¶ 24. Defendants contend that the remainder constituted interest payments as well other components which Ainsworth is still investigating. *Id.* To the extent Plaintiff contends that the fact that the total check issued by the IRS exceeds the original amount claimed by Enginuity and therefore results in no loss by Defendants, this is a factual dispute and thus not appropriate for resolution at the summary judgment stage.

However, Plaintiff again misunderstands the nature of Defendants' counterclaim. As Defendants correctly argue, the counterclaim is not seeking to challenge or reopen the Working Capital Adjustment negotiations. Defendants' counterclaim is instead predicated on the representations that the Sellers made in the MIPA. While the ERC's inclusion in the Closing Working Capital is certainly relevant to the dispute, Defendants are correct that the counterclaim is brought under a discrete section of the MIPA. Any potential waivers made as to the Closing Working Capital do not preclude Defendants from arguing that they suffered a loss as a result of Plaintiff's breach of a Fundamental Representation in the MIPA.

**D. The Voluntary Payment Doctrine Does Not Bar Defendants' Counterclaim**

Plaintiff's final argument is that Defendants counterclaim is barred by the voluntary payment doctrine. The voluntary payment doctrine bars recovery where a party has "voluntarily paid money with full knowledge, or means of knowledge of all the facts, without any fraud having been practiced upon him." *Liss & Marion, P.C. v. Recordex Acquisition Corp.*, 603 Pa. 198, 983 A.2d 652 (2009) (quoting *In re Kennedy's Estate*, 321 Pa. 225, 183 A. 798, 802 (1936)). Plaintiff argues that Defendants have not identified any potential mistake of fact which would preclude application of the voluntary payment doctrine. Specifically, Plaintiff argues it undisputed that i) Ainsworth vetted the ERC claim and yet still agreed to include it in the Working Capital Statement and ii) Ainsworth chose to settle the ERC appeal with the IRS despite opportunities to continue its appeal. *See* ECF No. 77, at 22. Defendants counter that its claim for indemnification is based on facts that were not known at the time. ECF No. 95-1, at 20. Specifically, Defendants argue it was unknown the IRS would later disallow a substantial portion of the ERC and, more critically to the present inquiry, Mooney represented during the Working Capital Adjustment negotiations that the ERC would be fully realized. *See* ECF No. 95-1, at 20. Defendants direct the Court to testimony

from Mr. Hinchey and Mr. Mota in which they testified that they accepted the $646,000 at face value and received assurances that it would be fully realized. Defs. Resp. Br., at 20.

The Court agrees with Defendants that there are factual disputes which preclude granting summary judgment based on the voluntary payment doctrine. "The [voluntary payment] doctrine applies only when payments are made due to a mistake of law***, not a mistake of fact***." *Gahagan v. Penn Abstract & Land Servs.*, LLC, No. 1:24-CV-01921, 2025 WL 3644253, at *2 (M.D. Pa. Dec. 16, 2025) (emphasis added). As Defendants correctly argue, their claim is predicated on the idea that a mistake of fact – caused by Plaintiff's misrepresentation – exists. Plaintiff argues that because there was no misrepresentation under the MIPA, there was no mistake of fact. Pl. Br., at 22. While Plaintiff's will no doubt argue this as trial, genuine disputes of material fact exist as to the issue which preclude summary judgment.

Finally, Plaintiff appears to argue, summarily, that Defendants' choice to settle the ERC appeal with the IRS bars any indemnification claim. *See* Pl. Br., at 22. ("Ainsworth also chose to settle the ERC appeal with the IRS for a lower credit amount despite having opportunities to continue its appeal with the IRS. Sellers are not required to indemnify Ainsworth for agreeing to accept less than it was owed by the IRS."). To the extent Plaintiff does make this argument, it is not supported by the law. As the Pennsylvania Superior Court explained in *Burlington Coat Factory of Pennsylvania, LLC v. Grace Const. Mgmt. Co., LLC*, "if a contractual indemnitee settles an underlying action, the law does not prohibit recovery. Rather, courts must consider the validity of the underlying claim and the reasonableness of the settlement." 2015 PA Super 227, 126 A.3d 1010, 1023 (2015).

## V. CONCLUSION

The Court finds that Defendants have raised a genuine dispute of material fact for their counterclaim for indemnification.

Accordingly, the Court **DENIES** summary judgment for Plaintiff on Defendants' counterclaim. An appropriate Order follows.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge